## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

STEVEN SCHNEIDER,

               Plaintiff,

-vs-                                     Case No.  2:10-cv-139-FtM-29SPC

WALGREEN CO.,

               Defendant.

_____

## REPORT AND RECOMMENDATION

## TO THE UNITED STATES DISTRICT COURT

      This matter comes before the Court on Plaintiff Steven Schneider's Motion for Judgment on the Record (Doc. #28) and Defendant Walgreen Co.'s Dispositive Cross-Motion for Summary Judgment (Doc. #29), each of which were filed with the Court on July 5, 2010.

## INTRODUCTION

      Plaintiff Schneider was employed as a pharmacy manager by Defendant Walgreen Co. ("Walgreens"), and he participated in an income protection plan sponsored by Walgreens that provided both short and long-term disability benefits.  In this action, Schneider alleges that he was wrongfully denied certain long-term disability benefits under this plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

      In his motion for judgment on the record, Schneider seeks, among other things, an order reinstating the denied benefit; arguing that the benefit denial was both wrong and an abuse of discretion. He further asserts that he should be deemed to have adequately exhausted his

administrative remedies under the plan or otherwise excused from his obligation to do so.  In its cross-motion, Walgreens asserts that the benefit denial was neither wrong nor an abuse of discretion and that Schneider did not adequately exhaust his administrative remedies under the plan. Walgreens thereby argues that, on either basis, it is entitled to summary judgment in its favor and an order dismissing Schneider's claims with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1)(B), Rule 72(b)(1) of the Federal Rules of Civil Procedure and the Court's referral of July 5, 2010, the undersigned United States Magistrate Judge has reviewed the parties' briefs in support of and in opposition to these motions, as well as the administrative record filed with the Court, and now enters proposed findings of fact and a recommended disposition of the parties' motions as set forth below.

## FACTS

### *Schneider and Events Pre-dating his October 11, 2007 Disability Claim*

Schneider is a 49-year-old pharmacist who has grappled with a lifetime of mental health issues.  He has had a long history of obsessive compulsive disorder symptoms starting as a child, and he began seeing therapists from a young age to address the effects on him of the domestic instability and mental health issues in his immediate family (AR 903-904).[1]  He also sought therapy after his father's death, and during an office visit with a physician late last year, Schneider reported that he has never got over his father's death at a relatively young age and that he has a chronic fear of dying (AR 904).  Nevertheless, Schneider completed school, obtained two bachelor's degrees,

---

[1]Defendant Walgreens filed a copy of the Administrative Record on May 24, 2010 (Docs. 18-24).  The record is bates stamped 000001 to 000965.  For ease of reference, citations herein to the Administrative Record omit the leading zeros.

and successfully progressed in his career.  He obtained a BA in Psychology in 1986 and then worked as a life-long learning teacher for the elderly for a few years.  He then obtained a BS in Pharmacy in 1991, and since that time he has worked as a pharmacist in chain drug stores and other settings for various companies (AR 373, 655-656, 663, 903).  He had problems at times early in his pharmacy career due to his compulsion to count, recount, and repetitively check his work, but he reported being treated effectively for this over the years with SSRIs (AR 904-905).  He began working for Walgreens as a Pharmacy Manager on August 11, 2003 (AR 25, 183, 656).  And he has been seeing his psychiatrist, Dr. Kenneth Gold, for anxiety and depression since 2004 (AR 904).

On January 14, 2005, Schneider had a new-patient office visit with Dr. Saira Hashmi-Alikhan, during which he complained of lower back pain that had begun three days prior and which radiated into his left leg down to his ankle (AR 192).  Dr. Hashmi-Alikhan recorded that Schneider's past medical history included herniated cervical and lumbar discs in 2000 and depression.  Dr. Hashmi-Alikhan suspected a herniated disc, ordered an MRI of the lumbar spine, and provided medications for pain and spasm relief (AR 193).  During a follow-up office visit five days later, Dr. Hashmi-Alikhan noted that the MRI showed a herniated disc, that Schneider's back symptoms "are a little improved," and that he was "getting around a little better and wants to try to go back to work" (AR 194).  Schneider requested additional Percocet tablets, which Dr. Hashmi-Alikham renewed, noting that Schneider was aware that they were to be used "only temporarily" (Id.).  Dr. Hashmi-Alikham recorded that Schneider claimed to avoid narcotics while at work and would use ibuprofen instead (Id.).

During follow-up visits with Dr. Kent J. Lyon on January 28, 2005, for bronchitis and with Dr. Ira S. Pearlstine on March 23, 2006, for a sinus infection, there were no recorded complaints of

back pain (AR 196-197).   And during a visit with Dr. Pearlstine on June 15, 2006, Schneider's complaints of dizziness, nausea and palpitations were assessed as symptoms of his experiencing anxiety attacks (AR 198).   Two months later, Schneider obtained a short-term disability leave and did not work from August 11 to September 11, 2006 (AR 241).   The assessment was fatigue and anxiety given the normal EKG and negative cardiac workup that were conducted in response to his complaints of chest pain (AR 199-201).   And notably, a genitourinary and musculoskeletal review of Schneider's symptoms on August 11, 2006, were negative for back pain (AR 199).   Dr. Pearlstine then completed an August 17, 2006 Certificate to Return to Work, stating that Schneider could return to work "with no restrictions" as of September 11, 2006 (AR 187).

A year later, on September 28, 2007, Dr. Anthony F. Afong of the National Pain Institute in Port St. Lucie, Florida, conducted an initial evaluation of Schneider (AR 41-46).   Dr. Afong recorded that Schneider complained of a history of low back pain that began five years ago in 2002 as well as bilateral knee pain, and that he presented with symptoms of low back pain (AR 41).   The onset of the pain was described as sudden, following an automobile accident in which Schneider was struck from behind (Id.).   The severity of the pain at the time of this office visit was claimed to be excruciating, with a numerical pain scale subjectively graded 9/10.   But, Schneider's activities of daily living and recreation had not been impacted (Id.).   Schneider also reported that his medical history included anxiety and depression, and that he was currently seeing Dr. Gold for psychiatric treatment (Id.).

Among other things, Dr. Afong reviewed previous diagnositc studies, including the January 18, 2005 lumbar MRI ordered by Dr. Hashmi-Alikham, a November 17, 2005 MRI, and an undated x-ray of Schneider's left knee (AR 44).   From the Lumbar MRI, Dr. Afong noted several instances

of disc dehydration, a single instance of disc protrusion with mild narrowing and moderate stenosis, a single incidence of a bulge with marked narrowing and mild stenosis, and no facet arthrosis (Id.). With respect to the diagnostic studies of the left knee, Dr. Afong found no evidence of cruciate ligament or meniscus injury or any other significant findings (Id.).

In addition to Schneider's then-current medications, Dr. Afong prescribed Oxycodone, Ibuprofen and a physical therapy regimen (AR 45). Noting that treatments such as local heat, manual therapy, and the use of anti-inflammatory medications had failed to adequately control Schneider's pain, Dr. Afong also recommended and Schneider agreed to undergo a 3-week course of injection therapies, the first of which was done during the initial evaluation (AR 45). Procedure notes report that the injections were conducted without conscious sedation and were well-tolerated, without any neurological compromise, but progress notes indicate that Schneider noted a worsening of pain and functional activity level after the injection procedures (AR 48, 54, 56, 58, 73, 78).

About two weeks later, on October 10, 2007, Schneider stopped working, and he submitted a disability claim the next day (AR 25-27). At that time, by virtue of his employment with Walgreens and at no cost to him, Schneider participated in the Walgreen Income Protection Plan for Pharmacists and Registered Nurses (the "Plan"), for which a Summary Plan Description ("SPD") was issued constituting "the official Income Protection Plan document for purposes of describing the various plan provisions" (AR 944, 946). As stated in the SPD, all benefits under the Plan are paid directly from Walgreens' assets, and while Sedgwick CMS acts as Walgreens' claims administrator for the Plan, Walgreens is directly responsible for the final adjudication of disability claims (AR 949, 963).

Under the Plan, benefits received during the first 180 days of a disability are called short-

term benefits, and benefits received after 180 days are called long-term benefits (AR 949).  With

respect to the long-term disability benefits at issue here, the SPD informs Plan participants that:

> For the long-term disability period, "disabled" or "disability" means
> that, due to sickness, pregnancy, or accidental injury, you are
> prevented from performing one or more of the essential duties of your
> own occupation and are receiving appropriate care and treatment
> from a doctor on a continuing basis; and
>
> for the first 18 months of long-term benefits, you are unable to earn
> more than 80% of your pre-disability earnings or indexed pre-
> disability earnings at your own occupation from any employer in
> your local economy; or
>
> following that 18 month period, you are unable to earn more than
> 60% of your indexed pre-disability earnings from any employer in
> your local economy at any gainful occupation for which you are
> reasonably qualified, taking into account your training, education,
> experience, and pre-disability earnings (Id.).

As set forth in the SPD, eligibility for Plan benefits is also subject to certain limitations for

pre-existing and psychiatric conditions (AR 956).  In particular, benefits are limited to a lifetime

total of 24 months if a disability is the result of a mental or nervous disorder or disease, unless the

disability results from schizophrenia, bipolar disorder, dementia, or organic brain disease (Id.).

Benefits under the Plan also stop when participants are released to return to work on a regular, full-

time basis, or are no longer disabled as defined by the Plan (AR 950).  But if participants remain

disabled, benefits may continue until they reach their Social Security Normal Retirement Age (id.),

which Schneider asserts would not occur for him until 2028 - some 18 years from now (AR 946;

Doc. 28 at p. 10).

### Plan's Award of Short-term Disability Benefits

By letter dated October 11, 2007, Sedgwick - the Plan's third-party claims administrator - acknowledged Schneider's request for disability benefits (AR 29-30). Sedgwick informed Schneider that it would contact his supervisor, Walgreens, and his physicians, and that it might follow-up directly with him for additional information to complete its review of his claim. Sedgwick requested that Schneider sign and return medical-information releases that accompanied the letter, and informed him that a copy of the SPD for the Plan was being sent to him by Walgreens. Notably, Sedgwick advised: "Please be sure to review that SPD. It contains all of the provisions about how benefits are determined and how you can qualify for them." This letter also advised Schneider that: "Sedgwick makes all determinations about your final eligibility for a benefit. Walgreens does not."

Four days later, Sedgwick disability specialist Carole Gazda informed Schneider by letter that he had been approved to receive short-term disability benefits from October 18, 2007, through November 30, 2007 (AR 60). She further advised Schneider that a continuation of these benefit payments would be considered based on a review of updated medical documentation. Thereafter, the record reflects that Schneider participated in one-hour physical therapy sessions on October 18, 22, 26 and 29, and November 12, 2007 (AR 75, 83, 90, 92, 106), and that he had office visits with Dr. Afong on October 23 and 29, and November 12, 2007 (AR 84-89, 94-99, 100-105).

The notes from the initial physical therapy evaluation of October 18, 2007, record that Schneider claimed his pain began a month before to years ago, and that it radiated into his left thigh and left knee (AR 75). He claimed that his level of function had been somewhat limited due to two previous motor vehicle accidents, in which his vehicle was rear-ended. The treatment plan was to see Schneider 2-3 times per week for 4 weeks with the long-term goal of having him return to work with minimal to no restrictions (AR 77). His rehabilitation potential was described as "good." And

Dr. Afong's progress note of November 12, 2007, records Schneider having reported that his symptoms were better, he was able to swim and the exercises were helping (AR 64). He claimed that he still felt pain but to a lesser intensity (Id.). Schneider noted improvement in his functional activity level, but did not feel he was able to sit at a computer for eight hours a day, or stand for prolonged periods of time, and felt it was too soon to return to work on December 3, 2007, as scheduled (Id.).

By letter dated November 13, 2007, Sedgwick approved further short-term disability payments through December 29, 2007 (AR 71). Thereafter, a physical therapy note from November 30 recorded that Schneider was struggling with balancing his activities with appropriate rest, and that he had occasionally overdone exercises contributing to increased pain symptoms (AR 108). Pursuant to Dr. Afong's orders, MRIs of Schneider's lumbar spine and both his knees were done on December 5, and in a progress note of December 12, 2007, Dr. Afong noted that the left knee MRI indicated no cruciate ligament or meniscus injury; the right knee MRI indicated a small medial meniscus tear, but no acute injury; and the lumbar MRI findings showed no change from the January 18, 2005 diagnostic study (other than a possible right renal cyst) (AR 128).

On December 21, 2007, Sedgwick disability specialist Gazda once again extended Schneider's short-term disability benefit through February 23, 2008 (AR 130-131). Six weeks later, Dr. Afong's February 4, 2008 progress note recorded that Schneider continued to complain of low-back and knee pain, and that his symptoms were worse due to a fall (AR 133). At this point in his course of treatment, approximately four months after its initiation, Dr. Afong noted that Schneider's response to treatment included a decrease in the intensity of pain, and improvements in response to both the medication regimen and physical therapy (Id.). His behaviors were within the expected

context of disease and he displayed appropriate social interaction.  His facial appearance was relaxed, he demonstrated normal verbalization, and his mobility and range of motion were within normal limits. He used his medications as prescribed, and was compliant with pain treatment and workup.  The only medication side-effect was constipation.  But Dr. Afong nevertheless completed a Work Status form indicating that it was in Schneider's best interest to be excused from all work duties until April 2, 2008 (AR 140).

By letter dated February 19, 2008, Sedgwick disability specialist Gazda advised Schneider that his short-term disability benefits had been approved through April 9, 2008, and that this was the maximum time allowed under the Walgreens Short Term Disability Plan (AR 141-142).  Gazda asked him to contact her soon so he could receive a packet of information regarding long-term disability benefits (if he had not received it already), and encouraged him to review the packet, fill out the appropriate forms, and return them as soon as possible (Id.).

### *Initial Award and Termination of "Own Occupation" Long-term Disability Benefits*

On April 2, 2008, Sedgwick Long-Term Disability Examiner Jamie Perez wrote Schneider and informed him that a review of his case indicated that he may be eligible for long-term disability benefits, even if he was receiving other benefits such as Worker's Compensation (AR 368-369). Enclosed with the letter were forms for him to complete for the processing of his claim, and she asked him to return the forms as soon as possible to expedite the processing of his claim.  She explained that eligibility would require him to be "totally disabled from [his] job at Walgreen's," and that after two full years of disability, which in this case would mean after the expiration of both the six months of short-term disability and the first 18 months of long-term disability, his eligibility

for long-term disability benefits would then require him to be "totally disabled from any and all occupations for which [he is] reasonably fitted by education, training or experience" (AR 368). Finally, Perez advised Schneider that the Plan required that he apply for SSDI benefits and provide proof of same to Sedgwick, and that Sedgwick would provide a Social Security Specialist to help him with his SSDI claim or answer any questions (AR 369).

Schneider then submitted an April 9, 2008 application for long-term disability benefits and described the nature of his disability as "back and neck injury also torn miniscus in right knee; severe depression and anxiety" (AR 375-377). He claimed that he first noticed symptoms in July 2007, and that his claim was for a work-related injury that occurred in July 2007. His claim form states: "I lifted some furniture from the pharmacy to the waiting area but I never reported it to Walgreens because I didn't feel pain until around July 2007" (AR 375). As reflected in the record, Schneider's psychiatrist Dr. Gold indicated in a form dated February 5, 2008, that Schneider had a temporary total psychiatric disability and a projected maximum improvement within 6-9 months (AR 363, 143). Following Schneider's office visits with Dr. Afong as well on February 4 and March 25, 2008, Sedgwick long-term disability specialist Jamie Perez advised Schneider by letter dated April 11, 2008, that his claim for long-term disability benefits had been approved for April 8 to June 2, 2008 (AR 357-361, 379-385, 387-388).

In April 2008, an EMG/NCV study of Schneider was performed and, noting that the findings were consistent with bilateral focal median neuropathy at the wrist, Dr. Afong added carpal tunnel syndrome to his diagnoses (AR 390-396). Dr. Afong decided to initiate conservative therapies, and his recommended treatments at that time included the continuation of physical therapy, massage therapy, hot moist pack, ice packs, and a Neuromuscular Stimulator (AR 390). Schneider was

instructed to wear bilateral wrist splints at night, and to use a paraffin wax spa for symptom relief. The prescription for Oxycodone and the orders for physical therapy were continued (AR 395).

On May 21, 2008, Schneider visited Dr. Afong for routine prescription renewals (AR 409-415). At that time, Dr. Afong noted that Schneider continued to attend physical therapy sessions 2-3 times per week and that he continued his home exercise program daily and found it beneficial (AR 409). A week later, Sedgwick's logs record that during a May 28, 2008 telephone conference Schneider informed Sedgwick that he had a surgical consult scheduled for June 11, 2008, with orthopedic surgeon Dr. Seth Williams, and he had an upcoming June 13, 2008 appointment with the Social Security Administration (AR 354). By letter dated the same day, May 28, 2008, long-term disability specialist Scott Sturm advised Schneider that his long-term disability benefit had been approved through June 30, 2008, and he requested that Schneider submit additional information by June 23, 2008, for Sedgwick to consider an extension of these benefits (AR 405).

A June 4, 2008 progress note by Dr. Afong then reports that Schneider claimed his symptoms were worse, but that he was unsure why (AR 416-422). Schneider further claimed that he was more depressed due to his pain and financial situation, but he advised Dr. Afong that he needed to go down south to help his mom with a scheduled endoscopy (AR 416). Dr. Afong noted that Schneider's "increase in symptoms is likely due to his increased anxiety with his finances and home as well as work" (AR 421).

Later that month, on June 25, 2008, Schneider had the aforementioned surgical consult with Dr. Seth Williams of the University of Miami's Miller School of Medicine. Dr. Williams' notes from the consult reflect that Schneider claimed he had a car accident "about 10 years ago," and that following conservative physical therapy he "did great and had a full recovery." Schneider further

claimed that in the year 2000, he was at work moving something heavy and developed pain in his back and knees.  Dr. Williams examined Schneider and reviewed an MRI of his lumbar spine (AR 424).  Among his various findings and observations, Dr. Williams noted that Schneider appeared to have a "quite limited range of motion of both the lumbar spine and the cervical spine secondary to pain" (Id.).  In his assessment, Dr. Williams concluded: "It is difficult to say with certainty if this patient's pain in the arms and legs is secondary to cervical or lumbar pathology.  I do not think the surgery is the best option. I think that a prolonged course of physical therapy will likely result in slow, gradual return of function.  My estimate is that he will be out of work for the next 6-12 months (AR 425).  Subsequently, Sedgwick long-term disability specialist Scott Sturm wrote Schneider on July 1, 2008, to advise him that his long-term disability benefits had been extended to October 31, 2008, and that additional information would need to be submitted by October 15 to consider another extension (AR 427).

Meanwhile, on August 28, 2008, the Social Security Administration notified Schneider that, based on a review of his health problems, he did not qualify for disability benefits (AR 429-430). The administration reviewed reports from Schneider's medical providers and determined that his condition was not severe enough to keep him from working.  In particular, the administration concluded that while Schneider may not have been capable of "performing heavy work," the medical record showed that he was able to communicate, act in his own interests, adjust to ordinary emotional stresses, get along with others, do his usual daily activities without assistance, and perform work that did not require heavy lifting.  Therefore, his claim for disability was denied (AR 430).  Schneider requested reconsideration concerning this denial on October 16, 2008, but he informed the administration that he had "no additional evidence to submit" (AR 433).

The administrative record further contains progress notes of Schneider's physician Dr. Afong for office visits on October 3, October 31, November 6, and November 21, 2008 (AR 490-496, 507-513, 518-524, 527-533), and daily treatment notes for physical therapy sessions on October 3, 10, 14, 17, 28, and 31, 2008, and November 4 & 21, 2008 (AR 497-498, 499-500, 501-506, 514-517, 525-526). Apparently in reference to the fall that Schneider claimed to have experienced as recorded in Dr. Afong's progress note of February 4, 2008, the physical therapy treatment notes during this period identify February 2, 2008, as the "Date of Injury" (see, e.g., AR 505). Notably, a progress note from October 3, 2008, records that Schneider was packing boxes in preparation for a move to Boca Raton, and a therapy note from October 31 records that Schneider was "independent with most stretching and strengthening activities" (AR 497, 490, 514).

An October 31, 2008 progress notes also reports that Schneider claimed his mood had improved further and that he would be going on a cruise with friends in three weeks (AR 437). Dr. Afong noted that Schneider continued in physical therapy, that he was doing his home exercise program regularly, and that he believed he was making progress (Id.). Schneider also reported improvement in his hand using the dorsal wrist brace (Id.). But in addition to the constipation noted in several previous progress notes, Dr. Afong recorded that Schneider was experiencing shortness of breath and dry mouth as medication side-effects (Id.).

On November 6, 2008, Dr. Afong sent a Physical Capacities Exam to Sedgwick disability specialist Sturm. In Dr. Afong's assessment, Schneider was able to sit for two hours, stand for two hours and walk for one hour with ten minute breaks every ten minutes; view a computer screen for two hours with ten minute breaks every thirty minutes; occasionally perform simple grasping and fine manipulation; and rarely lift or carry twenty pounds floor to waist, lift or carry fifteen pounds

-13-

waist to shoulder, or lift or carry five pounds over shoulder (AR 452).

Schneider also continued to have office visits with his psychiatrist, Dr. Gold , on September 17, October 27, and November 7, 2008 (AR 456-461).  Other than noting that Schneider's mood was depressed on October 27, and depressed, anxious and irritable on November 7, Dr. Gold otherwise indicated in his mental status evaluation during each of these three visits that Schneider's speech, thought process, thought content, self-perception, memory, abstraction, cognitive function, judgment, insight, and orientation were normal or intact (Id.).  In each of these progress notes, Dr. Gold also recorded that Schneider was not experiencing any medication side-effects (AR 457, 459, 461).  But in a Mental Health Treatment Provider Statement dated November 7, 2008, and transmitted to Sturm four days later, Dr. Gold indicated that Schneider's cognitive functioning was impaired due to trouble concentrating, trouble focusing, and sedation from his pain medications (AR 454, 455).  In this statement, Dr. Gold also suggested that Schneider's pre-existing psychiatric conditions were aggravated by his pain, otherwise deferred to Dr. Afong's opinions concerning Schneider's ability to continue working, and advised that he was not able to assess an estimated return to work date (AR 455).

At this juncture, Sturm requested external physician advisor review of Schneider's pain management and psychiatric issues from Network Medical Review, Inc., a URAC accredited independent review organization (AR 347).  In response, Elite Physicians, Ltd. (a subsidiary of NMR), provided a November 13, 2008 Review from Dr. Philip Jordan Marion, board certified in physical medicine and rehabilitation, board certified in pain management, and associate clinical professor with George Washington University Medical Center.  Dr. Marion states in his review that he conferred with Dr. Afong on November 7, during which Dr. Afong indicated that Schneider was

-14-

functionally capable of working at the sedentary occupational level, that Schneider did not have any specific cognitive deficits, and that he was not restricted from driving a motor vehicle (AR 469). Dr. Marion also reviewed the progress notes of Dr. Afong from April 17 to October 31, 2008, the notes of Dr. Williams from June 25, 2008, and the April 10, 2008 EMG/NCS previously ordered by Dr. Afong (Id.). Dr. Marion concluded that, from a physical medicine and rehabilitation perspective, there was no objective impairment precluding Schneider from performing the routine duties of his job as a pharmacist as of November 1, 2008 (AR 471). As Dr. Marion explained in his rationale:

> Extensive clinical workups have failed to demonstrate a definitive diagnosis correlated with his complaints of full body pain and functional capacity. Treatment has not significantly changed over the past year and consists primarily of medication refills and physical therapy. However, the patient is otherwise independent with activities of daily living, ambulation, and not restricted from driving a motor vehicle (Id.).

For the psychiatric review, several attempts were made to contact and schedule a conference call between an NMR reviewer and Dr. Gold (AR 343-346). When Dr. Gold advised that he would not be available for several weeks if NMR could not conduct the conference with him on November 25, NMR arranged for a reviewer, Dr. Marcus J. Goldman, board certified in psychiatry and neurology, to review the file and confer with Dr. Gold later that day (AR 343, 472-474).

In his November 26, 2008 review, Dr. Goldman recorded that Schneider first visited with Dr. Gold in March 2004, that he had a chronic history of depression and obsessive-compulsive disorder, and that in terms of global functionality, Schneider was able to bank, drive, and perform his activities of daily living (AR 472-474). Based on his conference with Dr. Gold and a review of data from Dr. Gold, Dr. Goldman concluded: "at the present time, a globally debilitating mental disorder that would prevent Mr. Schneider from performing the duties of his job from 11/01/08

onwards, simply cannot be supported." As he explained in his rationale:

> Mr. Schneider was not noted to be homicidal, psychotic, manic, aggressive, vegetative, obtunded, lethargic, or somnolent. Altered sensorium is not established nor has quantified cognitive dysfunction. Loss of global functionality cannot be supported. Mr. Schneider is suggested to be reasonably independent with the ability to drive, perform his [activities of daily living] and do banking. While Mr. Schneider may have significant adjustment issues related to his back injury, the data simply does not support the presence of a major DSM affective, or anxiety disorder for which work would be precluded from 11/01/08 onwards" (AR 474).

After its receipt of these external reviews, Sedgwick advised Schneider by letter dated December 2, 2008, it had been determined that he no longer qualified for continued disability benefits under the Plan (AR 477). The letter summarized the reviews provided by Drs. Marion and Goldman and concluded: "there is no medical documentation to support physical restrictions and limitations or functional impairments that would preclude you from performing your own job as a Pharmacist. Subsequently, your claim for Long-Term Disability benefits has been terminated as of November 1, 2008" (AR 479). Enclosed with the letter was an Appeal Form, and the letter advised Schneider that he had 180 days to request review. The letter further stated: "You may also submit additional medical or vocational information, any facts, data, questions or comments you deem appropriate for us to give your appeal proper consideration;" and that Schneider would "be provided, upon written request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to [his] claim for benefits." Finally, the letter advised Schneider: "You have a right to bring a civil action under [ERISA] if your claim for benefits is denied after there has been full exhaustion of your appeal rights under the Plan which includes both a first level and second level appeal" (AR 479; see also AR 341-343, 345-46).

Schneider submitted a written request for appeal dated January 21, 2009 (AR 483). Sedgwick acknowledged receipt of his appeal on January 27, 2009, and it advised Schneider that a review of his claim would be conducted by Sedgwick's Appeals Unit and that he would receive a written response by March 9, 2009 (AR 484).

### *Appeal and Reinstatement of "Own Occupation" Long-term Disability Benefits*

The administrative record indicates that Schneider's subjective reports of symptoms and medication side-effects changed markedly following the determination by Sedgwick that he was no longer eligible for, and during his appeal for the reinstatement of, the Plan's "own-occupation" long-term disability benefits.  For example, in his December 23, 2008 Progress Note, Dr. Afong recorded Schneider's claims that:

> He spent most of his time in his room while on the cruise due to pain and depression.  He said he had a miserable time in general.  He is very depressed, more so than before his back pain got worse.  He complains of numbness in both hands with neck pain, as well as increased pain in his left lower back and left leg to his ankle.  He also has dizziness and difficulty sleeping.

> He can only tolerate sitting and standing for 10 minutes at a time, constantly needing to change positions.  His hands bother him from his carpel tunnel syndrome with writing and simple grasping.  He is unable to lift more than 20 lbs on a rare occasion.

> The medications help to keep his pain manageable, however the medications cause problems concentrating, problems with his memory and formulating his thoughts.  He also has difficulty urinating, frequent spontaneous crying, impotence.

> He is very afraid that given his cognitive side effects from the multiple medications that he may make a mistake while filling prescriptions.  This can result in significant potential morbidity or mortality to his customers and is very aware of this (AR 534).

-17-

And further, Dr. Afong noted that with respect to Schneider's medication side-effects: "The patient reports constipation, shortness of breath, dry mouth, difficulty concentrating, drowsiness, sexual dysfunction, urinary retention."  Dr. Afong concluded that "given the above, [Schneider] cannot safely return to work as a pharmacist without the potential for causing significant morbidity or mortality to a customer through an incorrectly filled prescription" (AR 540).

Similarly, the administrative record contains an Activities Questionnaire apparently completed by Schneider for Dr. Gold on or about February 14, 2009, in which Schneider answered that he could sit in and drive a car for a few hours at a time, and that he had not experienced any memory or concentration problems, but he found it difficult to concentrate, focus, and remember facts, and was "very anxious and depressed" (AR 576-577).  In this questionnaire, the response to "How often do you travel or take vacation" was: "Just went on that cruise - how do I respond?" and for "How do you get there (transportation method)?" the response was: "I was transported in a wheelchair to cabin and stayed in cabin 95% of time" (AR 577).  On or about February 16, 2009, this questionnaire was enclosed with a letter faxed to Sedgwick by Dr. Gold, along with an Onset Date Questionnaire, a Multiaxial Evaluation Report Form, a Cognitive Capabilities Assessment and a Worker's Compensation form all dated February 14, 2009; a January 27, 2009 Mental Status Evaluation and Report; and progress notes dated January 27, 2009 (AR 557-581).[2]  In the Worker's Compensation form, Dr. Gold recorded that Schneider was "not injured at work," and that his psychiatric disability rating was "Permanent total" (AR 575).  And in his letter to Sedgwick, Dr.

---

[2]

But the Administrative Record indicates that an April 10, 2009 fax from Dr. Gold's office to Sedgwick later revealed to Sedgwick that Schneider had not been seen in Dr. Gold's office since December 12, 2008 (AR 615).

-18-

Gold observed that there had been a worsening of Schneider's clinical depressive disorder, generalized anxiety disorder, obsessive-compulsive symptoms, and panic attacks "since being unable to work due to his back condition," and that his pain medications caused "a fair amount of sedation with difficulty concentrating" (AR 569). Dr. Gold further stated that he had advised Schneider "to apply for Social Security disability benefits as I believe his current burden of psychiatric and medical problems render him totally disabled from being able to work at any position, let alone as a pharmacist" (AR 570).

Consistent with the procedures as outlined in the Plan, on February 19, 2009, Sedgwick Appeal Specialist Regina Winfield referred Schneider's appeal for the reinstatement of "own-occupation" long-term disability benefits to NMR for external physician advisor review (AR 582-586). In response, Insurance Appeals, Ltd., a subsidiary of NMR, provided reviews from Dr. Sankar Pemmaraju, board certified in physical medicine and rehabilitation, and Dr. Lawrence Albers, Diplomat American Board of Psychiatry and Neurology (AR 588-597).

As part of his review, Dr. Pemmaraju conferred with Schneider's treating physician Dr. Afong (AR 589). Dr. Pemmaraju's review indicates that they discussed Schneider's medical history, and that Dr. Afong reported that "the treatment plan will continue to be pain management conservatively," and that Schneider was unable to do his regular work activities that involved frequent standing (Id.). Dr. Pemmaraju also made two unsuccessful attempts to contact Schneider treating physician Dr. Pearstein [*sic*][3] (Id.). Dr. Pemmaraju reviewed and summarized progress notes from Drs. Afong, Williams, and Gold, the previous file reviews of Drs. Marion and Goldman, notes discussing Schneider's physical therapy sessions, lab results, the April 10, 2008 EMG/NCS

---

[3]A likely misnomer for Schneider treating physician Dr. Pearlstine (see AR 197).

ordered by Dr. Afong, and other records concerning Schnieder's medical history (AR 589-590).

From this review, Dr. Pemmaraju concluded:

> ... While the patient may have had some lumbar disc disease occurring, there was no indication that any specific dysfunction was occurring from the disc problems.  The patient was receiving the conservative treatment that was reportedly helping his condition and he was doing a home exercise program as well.  There was no documented electrodiagnostic study indicating whether any significant or severe lower extremity dysfunction or radicular findings were occurring from an objective standpoint as well.  The patient had mostly subjective pain complaints without significant or severe positive objective findings to account for the persistent pain issues. This is not enough to justify continued time off from work or work restrictions.    Therefore, based on the available documentation/information, the patient should have been able to return back to his regular job duties as of 11/01/08 through present. (AR 591).

Dr. Albers' review similarly reports that he conferred with Schneider's treating psychiatrist

Dr. Gold. (AR 593).  Among other things, the review indicates that Dr. Gold told Dr. Albers that

Schneider's hygiene had been poor at times, that Schneider complained of poor concentration, and

that there could be times when Schneider would not be able to drive because during one instance

Schneider took Xanax for a panic attack in Dr. Gold's office that precluded him from driving (Id.).

Dr. Gold did not believe that Schneider was malingering, and did not think that Schneider would be

able to return to work until his back was better (AR 594).   And contrary to the documentation

previously submitted to Sedgwick by Dr. Gold in February 2009, Dr. Gold advised Dr. Albers that

he had not done a formal mental status examination, but that he would still argue that Schneider was

not able to work as the impairment was not just cognitive (Id.).  Dr. Albers reviewed the same set

of records provided to Dr. Pemmaraju described above, and concluded that Schneider was disabled

from his own regular job as of November 1, 2008, and through to the time of his review due to the

significant dysfunction from the diagnoses of major depression, generalized anxiety disorder, obsessive-compulsive symptoms and panic attacks complicated by chronic pain (AR 596).   In support, Dr. Albers reasoned:

> Mr. Schneider has a history of chronic pain on multiple narcotics as well as significant depression and anxiety that has been treated with numerous psychotropic medications including antidepressants and benzodiazepines.  He is noted in recent months in his psychiatric notes to have deteriorated and recently had significant panic symptomatology in his psychiatrist's office requiring the addition of Xanax.  Anxiety would have been markedly impairing in his work setting should an episode like this occur in that setting (Id.).

With respect to the length of disability, Dr. Albers advised that he would expect Schneider to "be disabled at least for another four weeks" (Id.).  Subsequent to these independent reviews from Drs. Pemmaraju and Albers, Sedgwick advised Schneider by letter dated March 9, 2009, that it had overturned its previous claim decision in whole, that his claim had been reinstated, and that he had been approved to receive payments from November 1, 2008, through April 7, 2009 (AR 610, see also AR 332-333).

An April 13, 2009 progress note from Dr. Gold reported that Schneider was still depressed and had symptoms or complaints of grief, worrying, nervousness, nightmares, and crying spells; but that other than having a worrisome and sad affect, his mental status attributes were normal or intact, he was complying with his treatment plan, and he did not complain of any medication side effects (AR 617-618).  Nevertheless, by letter dated April 20, 2009, Sedgwick advised Schneider that approval for his disability benefits had been extended to July 31, 2009 (AR 620).  Schneider did not visit Dr. Gold again until just before the expiration of this extension of time for his benefits, and more than three months after his previous office visit (AR 624).  But following the receipt of

additional information from Dr. Gold, including a progress note for July 14, 2009, recording

sedation as Schneider's only medication side-effect, Sedgwick wrote Schneider again on July 31 and

advised him that he had been approved to receive disability benefits through October 10, 2009 (AR

627-634).

### *Application for and Denial of "Any Occupation" Long-term Disability Benefit*s

On July 22, 2009, Sedgwick wrote Schneider to remind him that for the first 18 months of

long-term disability benefits under the Plan, eligibility was predicated on an inability to earn more

than 80% of pre-disability earnings or indexed pre-disability earnings at his "own occupation" for

any employer in his local economy, and that eligibility thereafter would require an inability to earn

more than 60% of indexed pre-disability earnings from any employer in his local economy "at any

gainful occupation" for which he is reasonably qualified, taking into account his training, education,

experience, and pre-disability earnings (AR 625).  This letter further advised Schneider that his

eligibility for "own occupation" long-term disability benefits would end on October 10, 2009, and

for his payments to continue he would need to demonstrate eligibility for the "any occupation"

benefit (AR 626).

While Sedgwick had requested that Schneider submit his claim for, and any additional

documentation in support of, his eligibility for the "any occupation" benefit by August 21, 2009,

Schneider submitted his claim on September 8, 2009, describing the nature of his disability as back,

neck and hand pain not associated with any work-related injury (AR 626, 651-664).  In response to

the question as to why he could not work in his own or any occupation, the claim stated: "Even

though my medications help me manage the pain, I have problems [*sic*] concentration, memory and

basic and complex thought formulation.  I feel that given my cognitive side effects from multiple medications that it can be extremely dangerous as a pharmacist as well as any occupation at this time.  My mobility + range of motion are reduced" (AR 663).  Schneider, however, indicated that he continued to take continuing education webinars (Id.).  It also appears from the Administrative Record, that additional progress notes from Dr. Afong were submitted to Sedgwick for eight office visits approximately every four weeks from March 17, 2009, through September 3, 2009 (AR 635-649, 665-722).  Of note, these records report that Schneider declined recommended injection therapies on June 9 and July 6, 2009, and that a June 8, 2009 Lumbar MRI depicted no adverse change since December 2007 (AR 636, 688, 695).

Dr. Albers, the external reviewer on whose report Sedgwick had previously based its decision to overturn its December 2008 termination of Schneider's disability benefits, provided another review of Schneider's disability status on October 5, 2009 (AR 723, 726-728).  For this review, Dr. Albers conferred once again with Dr. Gold and reviewed Dr. Gold's progress notes and other medical records from September 17, 2008, to July 27, 2009.  Dr. Albers concluded: "it is clear that the employee would definitely be able to perform some type of gainful work as of 10/11/09.  There was no objective data to indicate sedation from medications. If this is indeed the case, the employee would be able to perform some type of at least simple repetitive tasks even if there are some medication side effects" (AR 727).  As Dr. Albers explained in his rationale:

> While there is subjective data for depression and anxiety symptoms, there is not significant objective data to indicate that Mr. Schneider would not be able to perform his job.  There is not significant objective data to indicate that Mr. Schneider would not be able to perform at least some gainful occupation as of 10/11/09.  In particular, there is no evidence of referral for psychotherapy which would be expected with a psychiatric condition of such severity

> resulting in functional impairment. He is not noted to require treatment in more intense levels of care and is not actively or acutely suicidal, homicidal, psychotic, manic, or displaying significant abnormalities of psychomotor behavior. There is no evidence of altered sensorium, quantified cognitive dysfunction, or loss of global functionality. ... Memory, cognition, and concentration are not demonstrated by mental status examination findings to be impaired. From a psychiatric perspective, the severity of symptoms noted in the medical records and in discussion with his treating provider does not support continued severity of impairment as of 10/11/09 (AR 728).

Soon thereafter, by letter dated October 9, 2009, Sedgwick advised Schneider that he did not qualify for the "any occupation" long-term disability benefit under the Plan, and that his disability benefits would therefore terminate effective October 11, 2009 (AR 738). The letter acknowledged the receipt of medical documentation from Drs. Afong and Gold, summarized the reviews of Drs. Pemmaraju and Albers, and concluded that "there is no medical documentation to support physical restrictions and limitations or functional impairments that would preclude you from performing any occupation for which you are qualified, taking into account your training, education and experience" (AR 740). The termination notice further advised Schneider that if he wanted to appeal this determination, he or his representative could "do so by submitting a written request for review of [the] denied claim (first level appeal) within 180 days," and that he had a right to bring an ERISA action if his claim for benefits was denied after there had been "full exhaustion of [his] appeal rights under the Plan which includes both a first level and second level appeal" (Id.; see also AR 315-317).

### *Appeal and Affirmance of Denial of "Any Occupation" Long-term Disability Benefits*

By and through his counsel, Schneider submitted his appeal of Sedgwick's decision to terminate his long-term disability benefits on January 13, 2010 (AR 744-750). In addition to notes and other documents from Drs. Afong and Gold (nearly all of which was already in the record) and

-24-

documents concerning diagnostic procedures previously discussed above (AR 751-902), Schneider's materials in support of his appeal included a neuropsychological consultation report from licensed psychologist John Mauldin, Ph.D., dated December 1, 2009 (AR 903-907), and a December 2, 2009 letter from licensed mental health counselor Deborah Taylor (AR 908-909).

Mauldin's report noted that Schneider presented as cooperative and compliant, that he was well dressed and groomed, and appeared his stated age, but that he also appeared "quite anxious" and his anxiety seemed to reduce his attention, concentration and overall performance (AR 903). Mauldin further notes that Schneider claimed he sustained a back injury at work in 2007 when he moved some furniture, and that while he suffered no acute discomfort at the time, he experienced pain that increased over the next few weeks and was unable to work one month later (Id.). Schneider also reported that he was injured in a motor vehicle accident years ago, but fully recovered.

During a seven-minute screen for Alzheimer's, Schneider showed moderate deficits in verbal fluency, mild deficits in time orientation and associative learning and memory, and no deficits in visuospatial skills. Mauldin noted that these scores resulted in a less than 10% probability of Alzheimer's, and that a screen six months later should be done to determine if there are any indications of disease (AR 904). Schneider obtained an overall normal assessment of neuropsychological functioning on the Luria-Nebraska Neuropsychological Battery, and displayed overall moderate cognitive and moderately severe memory deficits (AR 904-905). Overall, Mauldin's diagnostic impression found major depressive disorder, recurrent episode, severe without psychotic behavior; generalized anxiety disorder; obsessive compulsive disorder (by history); and that further study was recommended to rule out Alzheimer's Disease, drug-induced dementia,

dementia in conditions classified elsewhere without behavioral disturbance, or unspecified transient organic mental disorder due to general medical condition (AR 905-906). Among other things, Mauldin encouraged Schneider to remain as physically and socially active as he can, and specifically advised him to consult with his physician and consider taking daily walks, participating in other recreational activities with his friends, and vacationing up North and inviting friends to visit him (AR 906). Nowhere in his report did Mauldin offer any opinion or independent analysis concerning Schneider's ability to be engaged in any gainful occupation for which he is reasonably qualified.

In Taylor's December 2, 2009 letter to Schneider's counsel, she stated that she began treating Schneider on July 16, 2009, and that she had seen him seventeen times (AR 908). Taylor recounted that Schneider's presenting areas of focus were anxiety and worry, depression, and his perceived lack of ability to concentrate (Id.). She noted that Schneider reported evidence of depression, that she had witnessed two separate panic attacks, and that her diagnosis was anxiety disorder with panic attacks and phobic symptoms, and dysthmic disorder. Finally, she advised: "In my opinion, I do not support him returning to his previous occupation." Thus, as Mauldin likewise failed to do, Taylor did not opine or otherwise comment on Schneider's ability to be gainfully employed in any other occupation for which he is qualified.

Consistent with the procedures as outlined in the Plan, Sedgwick Appeals Specialist Angela Cannon referred Schneider's appeal to Insurance Appeals, Ltd. (a subsidiary of NMR), on February 4, 2010, for independent review (AR 912, 922). In response, Insurance Appeals provided reviews dated February 16, 2010, from board certified psychiatrist Dr. Robert N. Polsky, Diplomate, American Board of Psychiatry and Neurology, and Dr. Jamie Lee Lewis, board certified in both pain medicine and physical medicine and rehabilitation (AR 923-930). As noted in each of their reports,

numerous medical records were provided to Drs. Polsky and Lewis for their reviews, including progress notes from Drs. Afong and Gold, Mauldin's neuropsychological report, physical therapy records, the March 2008 and June 2009 MRI reports, the April 2008 EMG, and the file reviews previously prepared by Drs. Marion, Goldman and Pemmaraju (AR 923, 927).

But in addition to reviewing the medical records, Dr. Polsky memorialized in his report that he conducted a teleconference with Dr. Gold on February 12, 2010, during which Dr. Gold advised that he had not seen Schneider since Septemmber 2009 and had nothing to add to the clinical documentation already present (AR 923). Dr. Polsky's review also memorialized a teleconference with Schneider's therapist Deborah Taylor, during which Taylor recounted her observation that Schneider had been unable to sit still because of his pain, and her belief that he had "been essentially depressed all his life" (AR 924). And while Schneider complained to her of poor concentration, Taylor advised Dr. Polsky that she does not conduct mental status examinations (Id.). Summarizing the record, Dr. Polsky observed: "The clinical findings are of the claimant having a chronic pain syndrome due to some spinal issues for which he is being medicated. He is noted to be sad and depressed. This would make work more difficult, but it is not demonstrated to impact his ability to function in any occupation" (AR 925). Accordingly, Dr. Polsky concluded that "based on the available clinical documentation, [Schneider] is not determined to be disabled from the ability to perform any occupation for which he may be qualified by education, training, or experience as of 10/11/09 to the present" (Id.). Explaining his rationale, Dr. Polsky reasoned:

> The progress notes from [Schneider's] pain management physician, Dr. Afong, indicates a completely clear sensorium, with his being fully alert and oriented and notes no cognitive impairments. Dr. Gold's notes indicate that there are problems with concentration and attention, but these are not demonstrated by objective findings from

any mental status examinations that were done.  No mini mental status examinations were done.  None of the documentation indicates him to pose risk to himself or to others or to show signs of being manic or psychotic.  A neuropsychological test battery was done that indicated some mild impairment in his cognitive functioning, which is not enough to preclude him from performing the duties of any occupation as of 10/11/09 to the present (AR 926).

Dr. Lewis, on the other hand, provided a review based only on the provided medical records following four unsuccessful attempts to arrange teleconferences with Schneider's treating physicians Drs. Afong and Pearstein [*sic*][4] (AR 927-928).  Summarizing this review, Dr. Lewis stated:

Clinical findings in the medical records include some reduction in range of motion of the lumbar spine, normal strength and sensation on examination, and imaging studies showing age-related changes without any high-grade central or foraminal stenosis.  The above does not support the presence of a musculoskeletal restriction that would limit the claimant's ability to perform job duties.  Although EMG report comments on the presence of carpal tunnel syndrome, technical factors were suspected ... given the lack of abnormal sensory examination, [the absence of other abnormalities and otherwise normal findings] (AR 928-929).

Dr. Lewis therefore concluded that the "medical documentation does not support inability to work in the sedentary to light categories of work as of 10/11/09 to present from a physical medicine and rehabilitation perspective" (AR 929).

Consequently, by letter dated February 24, 2010, Sedgwick informed Schnieder through his counsel that he did not qualify for disability benefits under the Plan (AR 937-940).  In this notice, Sedgwick Appeals Specialist Angela Cannon summarized the independent reviews from Drs. Polsky and Lewis and advised Schneider that based on their analysis and conclusions it had been determined that he "was not disabled from performing any occupation for which he may be qualified

---

[4]See n.3, supra.

for based on his training, education, and experience" (AR 939).  For this reason, Sedgwick affirmed

the decision to deny long-term disability benefits from October 11, 2009, through Schneider's return

to work date (Id.; see also AR 307-308).  And with respect to any further review of its decision,

Sedgwick stated:

> If you wish to request a second appeal of this determination, you or
> your authorized representative may do so by submitting a written
> request for review of Mr. Schneider's denied claim within 90 days
> after your receipt of this letter. ... You may also submit additional
> medical or vocational information, and any facts, data, questions or
> comments you deem appropriate for us to give the appeal proper
> consideration.
>
> \*        \*        \*
>
> You have a right to bring a civil action under [ERISA] if your claim
> for benefits is denied after the second level of appeal.

There is no indication in the record that Schneider submitted any additional information or

requested any further administrative review.  Instead, by the filing of his Complaint on March 3,

2010, Schneider seeks an Order from this Court overturning the Plan's decision, declaring him

eligible for its "any occupation" long-term disability benefit, and awarding him other ancillary relief.


## **DISCUSSION**

### *Application of the Administrative-Exhaustion Requirement to the Circumstances of this Case*

There is no dispute that the Plan is an employee welfare benefit plan governed by ERISA.

Walgreens, however, asserts that Schneider's claims should be dismissed because he failed to

exhaust the Plan's administrative remedies.  In response, Schneider argues that given the underlying

facts he should be excused from his obligation to exhaust the Plan's administrative remedies, or that

the Court should deem them exhausted.

Generally, the administrative remedies provided for in an ERISA plan's claims process must first be exhausted before a participant may challenge an administrator's denial of benefits through an ERISA action in federal court.  See Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1204 1206 (11th Cir. 2003); Perrino v. So. Bell Tel. & Tel. Co., 209 F.3d 1309, 1315 (11th Cir. 2000); Counts v. American General Life & Accident Ins. Co., 111 F.3d 105, 108 (11th Cir. 1997).  Although not required by the text of ERISA, exhaustion is a court-imposed requirement based on the interpretation of the statute and congressional intent.  See Watts, 316 F.3d at 1207; Mason v. Cont'l Group, Inc., 763 F.2d 1219, 1227 (11th Cir.1985).  Thus, "the right to seek federal review matures only after [the exhaustion] requirement has been appropriately satisfied or otherwise excused."  Springer v. Wal-Mart Assocs. Group Health Plan, 908 F.2d 897, 900 (11th Cir. 1990).

Accordingly, "a district court has the sound discretion 'to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate,' ... or where a claimant is denied 'meaningful access' to the administrative review scheme in place."  Perrino, 209 F.3d at 1316 (citation omitted) (quoting Counts, 111 F.3d at 108, and Curry v. Contract Fabricators, Inc. Profit Sharing Plan, 891 F.2d 842, 846-47 (11th Cir. 1990)).  Indeed, the Eleventh Circuit has observed that the "decision of a district court to apply or not apply the exhaustion of administrative remedies requirement for ERISA claims is a highly discretionary decision."  Id. at 1315.

Furthermore, the failure of a Plan administrator to complete the final disposition of a claim in a timely manner may result in a "deemed exhaustion" of the claimant's administrative remedies, tantamount to the "deemed denial" formerly set forth in the ERISA regulations.  See Torres v. Pittston Co., 346 F.3d 1324, 1332 (11th Cir. 2003); 29 C.F.R. § 2560.503-1( 1 ); see also Coates v. Guardian Life Ins. Co., No. 8:07-cv-291-T-26TBM, 2008 WL 269133, at *2 & n. 6 (M.D. Fla. Jan.

30, 2008) ("The applicable regulations clearly permit the claimant to pursue his remedies of filing suit if the plan administrator has neglected to timely deny the claim, characterizing the situation as a 'deemed' exhaustion of administrative remedies."); Stefansson v. Equitable Life Assurance Soc'y of U.S., No. 5:04-cv-40-DF, 2005 WL 2277486, at *9 (M.D. Ga. Sept. 19, 2005) (noting the continued vitality of the principle of "deemed denial"); Seger v. ReliaStar Life, No. 3:04-cv-16-RV-MD, 2005 WL 2249905, at *7 (N. D. Fla. Sept. 14, 2005) ("It has been clearly established that once the ERISA regulatory deadline expires, a claimant may bring a civil action to determine the merits of her claim.") (quoting Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985)).

In the instant matter, Walgreens asserts that another round of appellate review with the Claims Administrator was available to Schneider, and that by not pursuing it Schneider failed to exhaust his administrative remedies under the Plan.  Attempting to paint immaterial misstatements and the conclusions of others with whom he does not agree as purposefully fraudulent, Schneider asserts that administrative review by the Plan is a sham and little more than a pretext for claim denials and therefore futile.  But futility cannot be established by presuming that the outcome of the appeal would be adverse on the merits.  Instead, "in this Circuit, courts have consistently equated the concept of futility with the inability of a litigant to present his or her claim for administrative review and to have that claim considered, without reference to the probable outcome of the administrator's review."  Spivey v. Southern Co., 427 F. Supp. 2d 1144, 1155 (N. D. Ga. 2006) (citing Perrino, 209 F.3d at 1318).  And "bare allegations of futility are no substitute for the 'clear and positive' showing of futility required before suspending the exhaustion requirement."  Bickley v. Caremark RX, Inc., 461 F.3d 1325, 1330 (11th Cir. 2006).

Eleventh Circuit precedent specifically forecloses Schneider's argument that his allegations of a sham or fraudulent review process should excuse him from exhausting his administrative remedies.  See Lanfear v. Home Depot, Inc., 536 F.3d 1217, 1225 (11th Cir. 2008) ("[T]he futility exception is about meaningful access to administrative proceedings, not a potential conflict of interest of the decisionmakers."); Springer, 908 F.2d at 901 (holding that asserting a conflict of interest or shared affiliation is insufficient as a matter of law to establish futility); In re Managed Care Litig., 298 F. Supp. 2d 1259, 1295 (S. D. Fla. 2003) ("[S]imple allegations of fraudulent conduct are not enough to invoke this [futility] exception.").  Thus, Schneider's presumption that further administrative review would be nothing more than a fool's errand because the outcome would be foreordained is nothing more than sheer speculation and fails to provide a "clear and positive" showing of futility.  Of particular note, Schneider's argument flies in the face of, and is squarely contradicted by, the facts in his case.  When he previously utilized the Plan's administrative review process and pursued an appeal with the claims administrator, Schneider obtained a reinstatement and 11-month extension of his "own-occupation" long-term disability benefits.  Thus, the facts in this case do not justify a finding that a second round of appellate review with the claims administrator would be futile, that an administrative remedy would be inadequate, or that Schneider was denied meaningful access to the Plan's administrative review process.

Moreover, this is not a case in which a plan administrator has failed to render a decision on the merits of the claim yet seeks to bar the claimant's access to federal court by asserting that it is diligently processing the claim.  On the contrary, Sedgwick timely denied Schneider's appeal within 42 days.[5]  Nor is this a case in which the claimant has somehow suffered from a delay in the accrual

---

[5]

Pursuant to 29 C.F.R. § 2560.503-1(f)(3), the Plan had 45 days to rule on Schneider's appeal.

of his right to sue.  Rather, the Plan's processing of Schneider's claims and appeals was expeditious and timely.[6]  In fact, it was Schneider who asked for and received extensions of time, and so the only delays that appear to have occurred in the process were solely attributable to him and for his benefit (AR 626, 651-664).  Accordingly, Schneider's resort to administrative remedies should not be deemed exhausted.

But given the particular circumstances in this case, the inquiry should not end here.  There is no support in the SPD, and presumably no support in the terms of the Plan (Walgreens does not cite to any Plan provision or provide a copy thereof), for multiple levels of appellate review by the claim administrator concerning Schneider's long-term disability claim.  In fact, the record confirms that Schneider completed all of claim submission and review procedures as set forth in the SPD.

Turning to the express language of the SPD, at the outset it declares: "This Summary Plan Description is the official Income Protection Plan governing document for purposes of describing the various plan provisions" (AR 944).  And it further warns plan participants: "You should read the information provided in this booklet so that you will have a full understanding of the benefits provided and the other relevant terms and conditions of the Plan" (944) (emphasis added).  In relevant part, the SPD states:

> **Procedures for Reviewing Claims**
> The claims procedures described below are prescribed by a federal law called the Employee Retirement Income Security Act of 1974 (ERISA).
>
> Initial Claims Determinations: All formal benefit claims under the Plan will be reviewed by Sedgwick CMS (the Claim Administrator),

---

[6] Plaintiff Schneider filed his appeal 96 days after Sedgwick's October 9, 2009 denial of his claim for "any occupation" long-term disability benefits.

which will make its decision, based on the information submitted by you, within 45 days after the claim is submitted.

\*       \*       \*

**Claim Denials**
If your claim is denied, you will be sent a notice from the Claim Administrator that will:

...
- include a statement of your right to bring a civil action under ERISA after receiving a final determination upon appeal; ....

**Appealing a Denied Claim**
To appeal a claim denial, you must send your appeal to the Claim Administrator within 180 days of receiving notice of the claim denial.

\*       \*       \*

**Claim Administrator's Review of Appeal**
The appeal will be conducted by the Claim Administrator, and the reviewer will be a named fiduciary who is neither the individual nor a subordinate of the individual who made the initial benefit determination and will take into account all comments, documents, records, and other information that you submit relating to the claim, without regard to whether the information was submitted or considered in the initial benefit determination.

If the initial denial was based on a medical judgment, the reviewer will consult with a health care professional who has appropriate training and experience in the medical field. This health care professional will not be an individual who was consulted in connection with the initial benefit determination or the subordinate of any such individual.

\*       \*       \*

**Notice of Decision on Appeal**

...
If the decision on appeal is denied, the Claim Administrator (or the Plan Administrator) will provide you with a notice of the denial that will:

...
- explain the Plan's claim review procedures (including relevant time limits) and your right to bring legal action under ERISA....

\*       \*       \*

**General Claims/Appeals Information**

...
You must first utilize the claim and appeal rights described above before you may properly assert any claims in court.  If you fully exhaust these rights, but remain dissatisfied with the outcome of your appeal, you may challenge the decision in an ERISA Section 502(a) benefit claim.

\*       \*       \*

**ERISA Rights**
...
If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in federal court, but only after you have exhausted your claims and appeals rights described above (AR 959-962).

From a plain reading of these provisions, only a single level of appellate review is required as the SPD neither mentions nor suggests multiple levels of appellate review by the Plan.[7]  Notably, nowhere in the "Notice of Decision on Appeal" section does it state that the claimant will be notified of either a right or an obligation to pursue yet another administrative appeal.  And while the SPD specifically sets forth with particularity the time line and procedural steps that will be utilized during a single round of appellate review, no such information is provided with respect to any further rounds of appellate review by the Plan.  Finally, in both the "Appeals Information" and "ERISA

---

[7]

While the SPD provides that Walgreens as the Plan Administrator may review a pending claim for unique issues such as the number of hours a claimant worked, at no stage in the procedure is a participant entitled to invoke this review, nor does it otherwise appear to represent a separate round of appellate review of the participant's claim (AR 959).

Rights" sections, the SPD informs claimants that they may file suit in federal court and challenge a benefit denial once they have exhausted the "claim and appeal rights described above." Thus, the "official Income Protection Plan governing document" that purports to provide all the information necessary to obtain a "full understanding" of the "relevant terms and conditions of the Plan," expressly grants claimants the right to commence an ERISA action if they are dissatisfied with the outcome from a single round of appellate review.[8]

Walgreens, however, directs the Court's attention to the three notices received by Schneider concerning the initial denial of his "own occupation" long-term disability benefit claim, and the initial and appellate denials of his "any occupation" long-term disability claim, and in particular the language near the end of each such notice advising him that any ERISA action would not be ripe until he exhausted an amorphous "second-level review" (AR 479, 740, 939). The Plan, however, should not be free to impose multiple levels of review in such an ad hoc manner, and the Eleventh Circuit's reasoning in Watts is instructive on this issue.

In Watts, the SPD did not explicitly state that using the Plan's administrative appeal procedure was necessary before a lawsuit could be filed, and instead left it reasonable for a participant to conclude that exhausting administrative remedies or filing suit was an "either/or proposition." 316 F.3d at 1208. Holding that the plaintiff's ERISA claim was not barred by the court-made exhaustion doctrine because she reasonably believed – based on the applicable SPD – that she was not required to exhaust her administrative remedies before filing suit, the court in Watts observed that the doctrine should not be applied when the SPD leads claimants "to conclude that

---

[8]

As provided in 29 U.S.C. § 1022(a), an SPD must "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

exhaustion was not necessary." Id. at 1209.  The court reasoned:

> Refusing to apply the exhaustion doctrine in these circumstances - call it an exception to the doctrine if you wish - will help promote the important purposes served by the doctrine.  We have previously summarized the policy reasons underlying the exhaustion requirement as including: "helping to reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." Curry, 891 F.2d at 846 (citations and internal marks omitted).  The more claimants are aware of the need to use administrative remedies before resorting to lawsuits, the more the purposes of the exhaustion doctrine will be served.  And our decision today will help ensure that employers and plan administrators take steps to clarify language that may cause claimants not to exhaust their administrative remedies. More clarity.  Better informed claimants.  More exhaustion of administrative remedies.  Id.

Similarly, refusing to apply the doctrine here will help ensure that employers and plan administrators take steps to clearly inform claimants of the need to exhaust multiple levels of appellate review, where they exist, and to define the terms and requirements thereof in the SPD as clearly intended by the statute.[9]  Indeed, with no such constraints, claim administrators could offer successive levels of review with each appellate denial and unduly forestall any judicial review of an administrator's decisions to deny benefit claims - contrary to the very intent and purposes of ERISA.

_____

[9]

While the court in Watts noted that the outcome there may have been different if the claimant had been notified in her claim-denial letter that she had to exhaust her administrative remedies before filing suit (316 F.3d 1208 n.2), it is an entirely different matter to allow a plan or claim administrator to impose through such notices serial levels of administrative review that could seemingly be without limit in number, lack any predefined parameters, and which are nowhere mentioned and may even contradict the procedures set forth in the SPD.  "This is a simple drafting problem to remedy," and it is appropriate to burden Walgreens with the task of clearly describing the Plan's administrative review procedures in its SPD.  Id.; cf. Lee v. Blue Cross/Blue Shield of Ala., 10 F.3d 1547, 1551 (11th Cir. 1994) (holding ambiguities in the SPD and plan are construed against the drafter).

The Court should therefore hold that Schneider has adequately exhausted his administrative remedies under the Plan as set forth in the SPD, or in the alternative, the Court should exercise its wide discretion and excuse Schneider's failure to exhaust his administrative remedies. Accordingly, it is respectfully recommended that Schneider's ERISA claim should not be dismissed based on an alleged failure to comply with the exhaustion doctrine.

### *Whether it Was Wrong or an Abuse of Discretion for the Plan to Deny Schneider's Claim for "Any Occupation" Long-term Disability Benefits*

"[I]n an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002), quoted in Curran v. Kemper Nat'l Servs., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (per curiam) (unpublished). "Hence, the 'standard' summary judgment considerations do not apply." Hert v. Prudential Ins. Co. of Am., 650 F. Supp. 2d 1180, 1190 (M.D. Fla. 2009); see Hunley v. Hartford Life and Accident Ins. Co., --- F. Supp. 2d ---, 2010 WL 1708718, at *5 (M.D. Fla. Apr. 26, 2010) (noting that "the typical standard of review for summary judgment motions does not apply in ERISA actions"); Crume v. Metro. Life Ins. Co., 417 F. Supp. 2d 1258, 1273 (M.D. Fla. 2006) (finding it "difficult to ascertain how the 'normal' summary judgment rules can sensibly apply" when reviewing an ERISA plan administrator's decision for reasonableness).

Rather, as set forth in the Eleventh Circuit's decision in Capone v. Aetna Life Ins. Co., 592 F.3d 1189 (2010), we are to apply a three-step standard of review in ERISA cases. First, we apply the de novo standard to determine whether the claim administrator's benefits-denial decision is

"wrong" (i.e., the Court disagrees with the administrator's decision); if it is not, then we may end the inquiry and affirm the decision.   Second, if the administrator's decision in fact is "de novo wrong," then we must determine whether he was vested with discretion in reviewing claims; if not, then we may end the inquiry and reverse the decision.   Third, if the administrator's decision is "de novo wrong," but he was vested with discretion in reviewing claims, then we determine whether the benefits-denial decision was an abuse of discretion to decide whether to affirm or deny it, with due consideration given to whether the administrator both reviewed and paid claims and thereby operated under a conflict of interest.   But regardless of the existence of any such conflict of interest, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest."  Id. at 1195 (internal citations omitted and quoting Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008)); cf. Richards v. Harfield Life & Accidental Ins. Co., 153 Fed. App. 694, 695 (11th Cir. 2005) (an ERISA claimant has the burden of proving his entitlement to contractual benefits).

Challenging Sedgwick's determination that he had failed to demonstrate his eligibility to receive the "any occupation" long-term disability benefit under the Plan, Schneider essentially attacks the credibility of the Plan's claim review process.   In particular, his three-pronged attack attempts to paint the reports and notices with which he disagrees as rife with fraudulent misstatements and omissions, suggests that a perfunctory and less than complete review was undertaken with respect to his claim, and insinuates that Sedgwick improperly maligned Schneider as an abuser of prescription narcotics to justify a denial of his claim.   Schneider further asserts that Sedgwick essentially ignored his "devastating neurological deficits indicative of early-onset dementia" (Pls' Mtn., Doc. 28 at 20).  Upon review of the record, however, each of these arguments

lacks merit.  Moreover, they miss the mark.  That Schneider may have various physical problems and mental health disorders is not dispositive.  Rather, Schneider must demonstrate based on more than just his subjective complaints that he is entitled to the "any occupation" long-term disability benefits under the Plan – that is, he must establish with objective medical evidence a requisite link between his various maladies and his alleged inability to work in any occupation for which he is reasonably qualified.  Hufford v. Harris Corp., 322 F. Supp. 2d 1345, 1356 (M.D. Fla. 2004); Fick v. Metropolitan Life Ins. Co., 347 F. Supp. 2d 1271, 1286-87 (S.D. Fla. 2004)).[10]

For example, Schneider paints Sedgwick's October 9, 2009 denial of his claim for "any occupation" benefits as "fraudulent" because, in a single sentence within a three-page letter, it misstates that Dr. Gold's July 14, 2009 session note "reported no side effects from medication" (AR 739).  While it is true that this otherwise difficult to read progress note does appear to indicate that Schneider claimed at that particular time that he was experiencing sedation as a medication side effect, numerous other session notes from Dr. Gold did not report that Schneider experienced any side effects from his medications (see, e.g., AR 457, 459, 461, 574, 618).  Moreover, during the Plan's appellate review of Schnieder's claim, external reviewer Dr. Polsky noted sedation as a claimed medication side-effect, and Dr. Polsky's review, among other things, was cited by Sedgwick as the basis for determining that Schneider was not disabled from performing any occupation for which he may be qualified (AR 924, 938).  Finally, there is no indication in the record that the

---

[10]

Indeed, the vagaries of subjective claims are highlighted here given the various etiologies Schneider offered over time and to different audiences concerning his pain complaints – sometimes he claimed his injuries were work-related, other times he did not, and sometimes he complained the pain lasted for years following a motor vehicle accident (or two), and other times he claimed (and the records appear to indicate) that he fully recovered from any vehicular accident in which he may have been involved.

misstatement in Sedgwick's October 9, 2009 letter was in any way purposeful, and given the totality of the circumstances it does not appear that this misstatement had any material affect on the decision to deny Sedgwick's claim.

Schneider's complaints in this regard otherwise represent his disagreement with the conclusions of others concerning his failure to provide sufficient evidence that his conditions precluded him from working in any occupation, but simply disagreeing with their reasoned findings does not provide a legitimate basis to characterize them as "fraudulent." In large measure, Schneider argues that his multiple diagnoses are alone sufficient to demonstrate that he can not participate in any gainful occupation. The independent physician reviewers and disability specialists that engaged in a review of his claim do not accept this leap of logic, and legitimately so. That they do not subscribe to an analytical approach that would free Schneider from his burden of proof does not make their analyses or conclusions in any way "fraudulent."

Schneider's criticisms directed to the thoroughness, objectivity, and analytical rigor of the claim review process likewise lack merit. For example, Schneider falsely asserts that during the appeal of his claim for "any occupation" benefits, independent physician reviewer Dr. Polsky only conducted a "paper review" of his file (Pls' Mtn., Doc. 28 at 16). This is a glaring misstatement of the record. Dr. Polsky's review discusses the teleconferences he conducted with both Dr. Gold (who conceded that he had nothing to add to the documentation already present and that he had not seen Schneider for the past five months), and Schneider's counselor Deborah Taylor (AR 923-924).[11]

_____

[11]Schneider likewise falsely asserts that Dr. Albers only conducted a "paper review" when he prepared an external physician review for Sedgwick's processing of Schneider's initial claim for "any occupation" benefits (Pls' Mtn., Doc. 28 at 22). In his written review, however, Dr. Albers provides a detailed summary of a teleconference he conducted with Schneider's treating psychiatrist Dr. Gold (AR 723, 728).

Schneider otherwise uses nothing more than innuendo and pejorative adjectives, such as "paid contractor," in an attempt to malign the independent physician reviewers as biased and unobjective. But there is no evidence in the record providing any credible basis to call into question either the independence or the professionalism of Drs. Marion, Goldman, Pemmaraju, Albers, Polsky, or Lewis. And each reviewer attested to the fact that there was no conflict of interest in their reviews with respect to the referring entity, benefit plan, enrollee/consumer, attending provider, facility, drug, device, or procedure, and that their compensation did not depend on the outcome of their reviews (see, e.g., AR 926).

It is also well-established that a claims administrator may rely on such independent medical examiners, and that there is no requirement to afford greater weight or deference to treating physicians than to the independent physician reviewers. See, e.g., Wilkins v. Sedgwick Claims Management Svcs., Inc., No. 8:09-cv-1009-T-26TGW, 2010 WL 1837812, at *5 (M.D. Fla. May 3, 2010); Stenner - Muzyka v. Unum Life Insurance Co. of America, No. 804CV984T17TBM, 2005 WL 1610708, at * 6 (M.D. Fla. July 7, 2005); see also Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). And that approach is particularly apt here because there is questionable probative value concerning the submissions from some of Schneider's medical providers. Cf. Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1572 (11th Cir. 1990) ("Even a self-interested [ERISA] fiduciary is entitled to choose an apparently more reliable source of information when sources conflict."). In particular, despite his subsequent disclosure to Sedgwick

on April 10, 2009, that he had not seen Schneider since December 12, 2008, Dr. Gold submitted several documents to Sedgwick that purported to reflect contemporaneous observations of Schneider in January and February of 2009 (AR 328, 557-575, 615).

As for Schneider's allegation that Sedgwick denied his claim based at least in part on a trumped up inference that Schneider was misusing his narcotics (Pls' Mot., Doc. 28 at 7-8), there is simply no credible evidence in the administrative record that Sedgwick wrongly accused Schneider of pharmaceutical misuse.  To the contrary, the record actually indicates that Schneider did, in fact, misuse narcotics if only for a short while.  Although it does not appear to have been a factor in any of the assessments or determinations made by either Sedgwick or any of the independent external physician reviewers, the record nevertheless reflects an occasion during which Schneider's treating physician, Dr. Afong, admonished Schneider about his misuse of Oxycontin (AR 416, 421-422).[12]

Schneider also overreaches when he attempts to use a psychologist's December 1, 2009 neuropsychological consultation report as evidence that he suffers from devastating deficits indicative of dementia.  Rather, in this respect, John Mauldin, Ph.D., merely suggested that additional screening and diagnostic procedures should be undertaken to rule out Alzheimer's disease and drug-induced or other conditions of dementia (AR 905-906).  Furthermore, the suggestion that he suffers from devastating deficits are belied by numerous objective facts.  None of his treating physicians determined that he should generally be precluded from driving a car, and his treating

---

[12]

Noting that Schneider "recognize[d] that it was wrong and [was] deeply apologetic" for utilizing twice the prescribed amount of Oxycontin per day, discontinuing the misused prescription, and warning Schneider that persistent noncompliance could possibly result in his being discharged from Dr. Afong's practice.

physicians observed that he generally complied with his prescriptions and physical therapy regimens. Schneider consistently demonstrated an ability to regularly travel to his appointments and to travel out-of-town, and according to his own reports he conducted his own banking, participated in continuing education webinars, and packed his own boxes for a change of residence.

Moreover, neither Mauldin's neuropsychological consultation report, nor the December 2, 2009 letter from Schnieder's counselor, Deborah Taylor, demonstrate that Schneider is precluded from working in any occupation for which he is reasonably qualified. Neither Mauldin nor Taylor offered any such conclusion or opinion. In fact, contrary to Schneider's misleading assertion that Taylor's letter confirmed Schneider's "disability from 'any work'" (Pls' Mot., Doc. 28 at 13), Taylor's letter instead states: "I do not support him returning to his previous occupation" (AR 909). Accordingly, Sedgwick did not err in discounting them when determining whether Schneider had demonstrated that he was medically precluded from working in any occupation for which he was qualified.

Finally, while a determination as to eligibility for SSDI benefits made by the Social Security Administration is not dispositive on the issue of whether a claimant is likewise eligible for disability benefits under an ERISA plan, a court may consider the Social Security Administration's determination of disability when reviewing a plan administrator's determination of benefits. Whatley v. CNA Insurance Cos., 189 F.3d 1310, 1314 n. 8 (11th Cir. 1999). And here, the Social Security Administration concurred with Sedgwick's determination that Schneider's conditions did not preclude him from working in any occupation whatsoever (AR 429-430).

Consequently, after reviewing the documents that Schneider submitted in support of his claim submissions, the medical reports of the external physician reviewers, and the other medical

documentation considered by Sedgwick in making its decision to reject Schneider's claim, the Court concludes that Sedgwick's eligibility determination with respect to Schneider's claim for "any occupation" long-term disability benefits was not flawed.  Because the denial of benefits was not de novo wrong, summary judgment should be granted in Walgreens' favor.

Nonetheless, even assuming the denial of benefits was de novo wrong, Walgreens would still be entitled to summary judgment.  There is no dispute that the claims administrator was vested with discretion in deciding claims.  And there is no evidence from which to draw any inference that the administrator adjudicating Schneider's claims and appeals operated under a conflict of interest. Further, the record demonstrates that Sedgwick provided a professional, conscientious, unbiased, and full and fair review of Schneider's claims.  Accordingly, given the evidence available to the Plan, the benefit-denial decision was neither arbitrary nor capricious.

Accordingly, based upon a thorough review of the record as a whole and the arguments presented by the parties in their motions, it is now

**RESPECTFULLY RECOMMENDED:**

(1)    Defendant Walgreen Co.'s Dispositive Cross-Motion for Summary Judgment (Doc. #29) should be **GRANTED**; and,

(2)    Plaintiff Steven Schneider's Motion for Judgment on the Record (Doc. #28) should be **DENIED**.

Within fourteen (14) days after service, any party may file and serve written objections to these proposed findings and recommendations; and any party desiring to oppose such objections shall have fourteen (14) days thereafter within which to file and serve a written response.  See 28 U.S.C. § 636(b); F.R.C.P. 72; Local Rule 6.02.

Failure to timely file written objections to the proposed findings and recommendations contained in this report shall bar an aggrieved party from attacking the factual findings on appeal and may otherwise waive any further judicial review of this report.  See United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988); see also Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988) (finding that a "[f]ailure to object to the magistrate's factual findings after notice precludes a later attack on these findings").

**Respectfully recommended** at Fort Myers, Florida, this  20th  day of September, 2010.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record